Case 3090123, Sony Music Distribution v. The Chiefs Counsel, please proceed Good morning, your honors. My name is Kimberly Emerson. I'm Chilton Yamgarten-Porter. I am here on behalf of Sony Music Distribution. You've got to keep your voice up. That's not a microphone in front of you. It's a recording device. I'm sorry. I would like to reserve some time for rebuttal in this. The first issue that we have in this case is a question of law. The Industrial Commission, or the Workers' Compensation Commission, is a statutorily constructed agency, and it only has the rights and powers that have been provided to it that are listed within the Act and that are part of these rules that's for the rules of pleadings within the commission. Rule 7020.20B specifically states that an application for adjustment of claim must be limited to one accident or claim. The question of law raised here is one of an interpretation of the rules of pleading before the Illinois Workers' Compensation Commission. Each application is very important in the practice at the Workers' Compensation Commission for numerous reasons. There are coverage issues that can be determined by the date of loss that is presented in an application, the determination of rates for benefits, or which laws apply at the time, and also a notice issue to determine whether notice has been provided, just to name a few. Due to the many variables that stem from the date of loss, it is a necessity that there be pleading rules at the commission and that they are enforced. Here, the petitioner in question, Mr. Treece, had filed only one application for adjustment of claim, listing only one date of loss for July 14, 2000. However, the arbitrator at the trial level made his decision based upon a review of four separate occurrences. Well, that's going to get down to the critical issue. Obviously, the arbitrator's finding was that the subsequent injuries, and I think, you know, there can be some argument made concededly that they were new injuries. The arbitrator took the position they were exacerbations, I think, or aggravations of the original injury. So why is that finding erroneous? And the commission found, obviously, the same. Why is that finding erroneous? That finding is erroneous if you look at the arbitrator's decision, and hence the commission decision who adopted the arbitrator's decision on causation and the weight to be given to the credibility of the testimony and witnesses and the medical records, based their opinion on the exacerbation and aggravation issue on the records of Dr. Koh and Dr. Cronin, Dr. Cronin being his treating physician and Dr. Koh being Mr. Cronin's treating physician. However, if you look at the complete set of those records, and specifically the narrative reports of Dr. Cronin and Dr. Koh, you can see that there is no medical testimony contained therein that states that these are aggravations or exacerbations of the July 2000 incident. Well, that's interesting. And I was wondering about that, because although the arbitrator cites Dr. Cronin, who was a treating physician, didn't Dr. Cronin also opine that the injury in October was a new injury, not related to the earlier injuries? Specifically, yes. He clearly states that in the records. The Petitioner went back in his briefs, focusing on the manifest weight issue and picking out the minutia of the medical records where there are some inconsistencies. He subsequently did, however, before trial. So you're saying that Dr. Cronin, strangely enough, you could make the argument that his opinion supports the finding that this was a new injury, or the argument that this was an injury? Correct. His report of September 26, 2002, specifically lists multiple dates of injuries with specific accident histories, specific new diagnoses. He lists an accident on February 6, 01. I'm sorry, February 1 of 01, which is the De Quervain State, the original injury being in July of 2000. He then mentions a new occurrence in May of 01, and then in his reference to the October 1 of 01, he clearly, without question, specifically states that it is a new injury. It is in no way related to the earlier injuries of the TFCC injury and the De Quervain's tenosynovitis, for which he'd reached maximum medical improvement and could return to work without restrictions on both of those cases. All right. The Commission also cited Dr. Coe, as you alluded to. However, it's my understanding Dr. Coe examined the claimant a single time, five and a half years after the initial injury. Is that correct? That is correct. And with Dr. Coe, Dr. Coe is well known at the Commission. He's performed numerous independent medical evaluations and given testimony on multiple occasions. Dr. Coe is fully aware of the issues that are before the Industrial Commission, the Workers' Compensation Commission, of aggravation and exacerbation, and yet I find it telling that in his report, he still didn't even, he wasn't able to say that the subsequent accidents that he lists, which he does list, I believe he lists five different accident dates, he was not able to say that they were aggravations or exacerbations of the July incident. He would only call them re-injuries, meaning another injury or injured again, instead of making the original injury worse. Did the re-injuries cause permanent partial disability of the left hand? Pardon me? Did Coe opine that all of the injuries, the 2,000 injuries and the two injuries in 2001, all together caused a permanent partial disability? Was that his opinion? Coe's opinion was that all of the injuries together caused a permanent disability. He was not able to say that the current condition of the petitioner was related to the original July 2,000 date of loss, the only one that the application was filed on. Does it need be anything more than a cause in order to be compensable? An injury only has to be a, an injury at work only has to be a cause of the condition, but the July 14, 2000 injury was a TFCC tear. And that, for that, the petitioner received conservative treatment, surgical repair, occupational therapy, had no complaints of pain or use, was returned to full-duty work, and then had a different injury that had a new diagnosis, another part of the hand, the complete opposite side of the wrist, albeit the same wrist, but it was a new tendon, a new nerve. Actually, the second one was a nerve, the De Quervain's tendosynovitis. Are you saying that the July 14 incident and the October were new injuries, both of them? All of them, yes. I believe that the July 14, 2000 injury was a specific injury. It was a hyperextension injury that involved, that resulted in the TFCC tear. He then had no complaints of pain, returned to work full-duty, and had a separate, distinct, and opposite injury of a flexion injury, bending his hand the opposite way, which caused the De Quervain's tendosynovitis. And then he had another minor occurrence at work where he complained of pain for the extensor tendon, and finally, in October of 2001, he jammed his wrist, and there was a diagnosis of a flexor carpe malnares tendonitis. Are you saying in the record that there is nothing that the commission could look at that would suggest that that body part in the original injury had been weakened or in some way impaired that made it more susceptible to the subsequent injuries? I believe that there is no statement from a medical physician in the record that states that. Do you disagree with the notion at minimum that he was entitled to TTD from July 19, 2000, through December 9 of 2000? That's only the first injury. No. You don't disagree with that? No. So you certainly don't disagree with the notion that there's a causal connection between whatever injury he suffered that required him to be off work from July the 19th to December 9th, do you? No. So your argument isn't with causation. Your argument is with the award. Your argument is that he wasn't entitled to any TTD from September 6, 2001, to November 11th, or from November 29th to December 13th, or from January 18th, 2002, to 5-2-0-2. I think your contention is those were the other injuries, and that he certainly is not entitled to the PPD award that they gave him. But you can't be arguing with causation if you agree with the notion he's entitled to TTD for the five months of 2000. We agree that there is causal connection for the July 14, 2000 incident and the resultant TFCC tear and treatment. And the TTD goes along with it. And the TTD and other thing else that goes with that incident. But when Dr. Cronin opines that he is at MMI and can return to work without any restrictions based upon the TFCC tear, then I think any further causal connection is severed definitely at that point, if not before, with the prior injuries. And what date did he opine that? And what date are you talking about? I believe that was in October 12, 2001, is when he specifically says very clearly and precisely in his records, and it's repeated in his report, that it's a, the flexor carpi ulnaris tendonitis is a new injury and unrelated at all to the TFCC and declare veins cases. And the claimant said he had been doing well and wasn't having any problems. Before he returned to work. Until he jammed his wrist. Pardon me? The claimant himself said he was doing well and wasn't having any problems until he jammed his wrist on that date, correct? Correct. Okay. And, frankly, that is what we're asking here, is just that this case be remanded back to the circuit court and then again remanded back to the commission with instructions that they prepare a decision that is restricted to only the accident that is filed on of July 14, 2000. At no time have we claimed even to address the causal connection issues to the 2101, February 1 of 01 date of loss, the May 01 date of loss, or the October 01 date of loss, because those cases have not been filed and they are not before the court to be argued at this time. All we're arguing mainly is that the resultant treatment, lost time, or anything other than that are not related to this July 14, 2000 date of loss. All right. So at what point, just to wrap up, are you arguing the claimant was no longer entitled to TTD in the October date? Or when are you making, at what point do you believe it should have been cut off? With regards to this July 14, 2000 date of loss, I believe that the TTD should have ended in that case when he was returned to work in February of 2001. I believe that's supported by Dr. Cronin's October 2001 statement that the flexor carpi ulnaris tendonitis was not related to either of the two separate and specific injuries that he sustained beforehand. I think that says, because there's nothing in his records that say that the the querve veins is related to the TFCC tear. So I think he's specifically listing at least three separate accidents, separate dates, and separate occurrences, injuries. That's my understanding of this item. Thank you. Thank you, Counsel. And you are Ms. Emerson. Emerson. Emerson. Okay. Thank you. Mr. Naughton, you may respond. Again, for the record, my name is Tom Naughton. I represent the petitioner. At the outset, obviously, we know what the issues are, so I won't restate them. But I want to make one thing clear at the outset regarding Dr. Cronin's opinions, which the appellant omitted, I believe, from the brief and from their argument, was that in this letter, Dr. Cronin, this is a letter that was requested by the respondent from Dr. Cronin. He said in his response, quote, as far as the querven's tendonitis is concerned, I cannot determine whether the motion that was performed actually caused the tendonitis or not for the left wrist, first dorsal compartment. And, again, emphasizing, certainly, the motion that was performed aggravated his situation and thus his work related. And I don't think that's been pointed out by the appellant in this case. Where is that contained in the record? Well, that would be exhibit number one of the record 341 and 337. Now, why was it that the commission awarded TTD for January 2000 to December 9, 2000, when Dr. Cronin never authorized him to go back to work full duty until January 16? Was he working light duty? He was working for the first two weeks. In January? The first two weeks he went back, he was light duty. Then Dr. Cronin said light duty for two weeks and then full duty. Okay. As far as what this Court has to determine today is not to re-litigate the issues where either side would cherry pick the facts in this case or the evidence in this case. The global question for this appellate court to determine is whether the findings of the arbitrator, which was adopted by the commission, which was adopted by the trial court, as to causal connection was against the man who persuaded the evidence. And I suggest it was not. I think Judge Pantagiaro in the trial court put it just very succinctly. She summed it up very succinctly in denying both my petition for review, the issues I had, and the Respondent. She said there's evidence to support both arguments regarding causal connection, but the commission chose to adopt the opinions of Dr. Cronin and Dr. Coe as there is evidence to support the commission's findings. The commission's findings are affirmed. Did the arbitrator opine why he believed that Coe and Cronin were more credible? No, other than just to say that he found them more credible in the opinion. He found the petitioner more credible than the young lady who testified for the company, and he found the opinions of Dr. Cronin and Dr. Coe, but I don't think he really elaborated what he based that credibility finding on. One question on that. You stated the test accurately, and obviously it is the function of the commission to judge the credibility and believability of the medical evidence and the weight to be given to that evidence. How do you respond, though, to her argument that in September of 2001, Dr. Cronin, who the arbitrator cites, clearly said that the claimant had reached maximum medical improvement with respect to his prior injuries. He related the claimant came in and said he was doing well. He did not relate any complaints or symptoms whatsoever, resumed his regular duties, and then he jammed his left wrist at work. He's arguing that's a new injury. The the but I and our argument is as part of the original claim because of the deteriorating condition of the wrist, and I cite we cite the Frickie case, that you can even have a outside cause, even outside of work, but if the original injury, the deterioration of the wrist from the original injury contributed to cause the subsequent aggravations, then it would be causally connected. To adopt the respondent's argument, every petitioner, every client would have to have this lawyer on speed dial because once these injuries occur, you don't know, you can't foresee whether they could be temporary, whether they could result in surgery. You would just basically be filing, you could be filing in many cases dozens of applications on the same claim if you were to adopt their argument and be in almost real-time communication with the petitioner. It's just the model, the model that she suggests is just not realistic or practical. Aside from that practical issue, and again, we're talking about the weight of the evidence, whether the finding is against the manifest weight of the evidence, what specific credible medical evidence supported the finding that the RSD was causally related back to the July 2000 accident? Well, we have we have we have the continuing, we have the continuing chain of events, both Dr. Koh and Dr. Cronin. Dr. Cronin never said any of these, I believe his records would indicate that, and I can't quote the specific records, that these were continuing problems and the only contradiction to Dr. Cronin's records that have been offered by the respondent is his question about whether he said that the motion performed aggravated his condition and was thus work-related. What did Dr. Koh say? Pardon me? What did Dr. Koh say? What's his opinion? Dr. Koh's opinion was that it was causally connected. Is his opinion actually that all three of these accidents caused this condition? I would more accurately characterize it in my view would be that it caused an aggravation of the original condition. Because of the original condition, the deteriorating condition of the original condition, that these aggravations were caused. We have to look at the total history here. He didn't say that. I can't represent to this Court that he said that directly, specifically. I'd have to look at the report itself. But you look at Dr. the problem here, the history here, is that the employer kept pushing this man back to work. He went back to work for a very short period of time and aggravated his risk to the point where he was taken off work permanently. Well, the arbitrator cited Cronin, and I ask opposing counsel this. Didn't Cronin clearly state that with regard to the October incident, the claimant's injury is new injury, not related to the earlier injuries? Didn't Cronin say that? But, yes, but he also said that the motion that was performed aggravated the situation and is thus work-related. So there's this general, we're sort of reading between the lines, there's this general weakening of the risks, and yet I'm looking for specific medical testimony that says that. Is there a difference between saying an initial injury weakened a hand and thus contributed to a second injury? Is there a difference between that and saying that the second independent injury aggravated the first condition? Well, our characterization of the history is that there's a difference between those two. I'm sorry. If you could please repeat that question again so I can ask it more accurately. You can have a situation where an initial injury weakens a body part such that in its weakened state it contributes to a second injury. Or you can have a situation where a person has an initial injury and a second totally independent injury aggravates that condition. Are they the same or are they different for filing purposes? In this case, in this case, our position or our judgment was that it all relates to the wrist. It all relates to the same body part. No question. The wrist. And I think it would be unfairly, place an unfair burden on the Petitioner to try to argue that the same body part is the same body part, and therefore, the same injury. The history here is overall. We say he injured his wrist. He was sent back to work. His work activities, he had his work activities cause new problems with the same body part. Very short period of time. Wouldn't the appropriate way to handle this have been to file three applications for adjustment to claimant X, they have them consolidated, and have the commission issue a single decision on all three together on the resulting injury? Isn't that the appropriate way to handle it? I think it would be, we could handle it that way. But I think the course of the claim, again, it wouldn't affect the underlying course of the claim. They have notice. They're defending. Doing IMEs back and forth, it would be a nice administrative procedure. But I don't think it would have changed anything what the Petitioner would have done, the Petitioner's attorney, or the respondents in terms of processing the claim. The head commander would say we're surprised or somehow prejudiced because the Petitioner district did treat it as one claim. Thank you. Thank you, counsel. Ms. Emerson, you may reply. Thank you, your honors. First, I just want to quickly address the August 31, 2001 note of Dr. Cronin's that counsel was referring to. In that note, Dr. Cronin does state that, well, first, his opinions that are stated in regards to the causal connection of de Quervain's were based on a direct request for his reply on the July 13, 2001 IME report of Dr. Skank, where Dr. Skank stated that he did not feel the Petitioner's work activities were significant enough to cause the de Quervain's and he thought it was unrelated to his work completely. Dr. Cronin replied, and it was specifically limited to the de Quervain's issue of non-causal connection in Dr. Skank's report. In reply to that, he said that I'm not able to state that this work he was providing in these two weeks period was significant enough to cause the de Quervain's tenosynovitis, but it aggravated an underlying condition. He didn't say it aggravated his original condition of the TFCC tear, which occurred on the opposite side of the wrist. He said it aggravated an underlying condition. So he already had the works of de Quervain's in his system and he went back to work and whatever he was doing aggravated that condition and that the de Quervain's was work related to February 1, 2001. With respect to counsel's opinions and statements that it would not be realistic to have the possible aggravations and exacerbations and they would need to be on speed dial, I think that's a bit of an over-exaggeration. The petitioner is allowed three years of a statute of limitations to file a claim. Those, that time had not even, had just run or not run by the time the trial was had. At any point after they found that there was an actual separate and specific diagnosis or at least at the point where he had surgery on the de Quervain's, it should have been might have wanted to file on a new accident or an alleged aggravation, however they wanted to proceed with it at that point. With respect to notice, there's a difference between notice of the accident, getting notice to the company and notice to the insurance company, medical bills being paid, temporary total disability being paid for subsequent accidents and or aggravations, however you want to term them. But I believe they're all separate injuries, separate new accidents. And even though there's notice given, the petitioner still has a burden of filing an application for those new accidents, new dates of loss within the statute of limitations. Just because they're claiming that something is related, may be related, there's still a statute of limitations out there and just because the respondent had noticed that a new injury occurred on a new date, doesn't mean they have noticed that the petitioner has filed an application for that claim and they're proceeding to trial on that claim. We can still pay the medical bills that we receive and prepare for defenses in the off chance the petitioner would file within the statute of limitations so that we don't lose the moment and the knowledge that's occurring at the same time. Counsel, just to try and pin down one point. Yes. In your request for a hearing submitted to the arbitrator, did you not stipulate as to the periods of time that the claimant was temporarily totally disabled? In that total, 46 and five-sevenths weeks. Is that correct? Our firm was not representing Sony Music at the time of trial. The firm that was representing them did fill out those dates of loss. Those are the dates of lost time. I'm sorry, dates of lost time. Those are the dates of lost time that the petitioner had been paid for. But they are dates of lost time that he had been paid for over the course of the July 14, 2000 injury, the Fairfax 2001 injury. Under the law, isn't a request for hearing in that stipulation binding on the parties? We are not claiming that we are due the TTD back. We're admitting that he is due that TTD under the other accidents, just that it's not related to this case. And by the sheer fact that they put those dates in there, it was a specific statement of lost time. It's not acknowledging any kind of causal connection or anything like that to the July 14, 2000 date of loss. Interesting. And with counsel referring to the case law he cited in FERC with subsequent accidents affecting the same body part, that was the same in that case. The petitioner had a work-related injury for carpal tunnel syndrome, and then he had subsequent personal occurrences at home, which they believed contributed to the carpal tunnel syndrome. But it's the same injury, the same symptoms and causes that were being treated for. Counsel, your time is up. Thank you. Thank you. This matter will be taken under advisement. A written disposition shall issue. Please call the next case. 209-0200, Riverdale School District, 210 versus Bayer. Counsel? Counsel? May it please the Court? Counsel? For the record, my name is Demetria Pouts, and I represent the appellant, River Ridge School District, number 210. We are here today because it is our position that the commission erred on three separate issues in its determination. We believe first that the commission erred in determining causation between the employee, Christine Byers, condition of ill-being and the incident which occurred on January 22, 2004. As a result of the commission's error in the first issue, we believe that there was a domino effect, and there was also a subsequent error in the commission's awarding of a prospective surgery, and also an error in their awarding of a prospective temporary total disability benefit payment that was to be made to Christine Byers while she was recovering from the prospective surgery that the commission awarded. Let's just clear something up. Do you concede that if the commission did not err in finding a causal connection that you lose on the other two issues also? Not necessarily, Your Honor. I believe that with this specific issue, if the panel finds that the commission erred on the first issue of causation. Well, then the rest is over. The rest is right. But that's not the question I asked you. The question I asked you is if the panel finds that the commission did not err on the causation. Do you have any other arguments relating to the other two issues? And yes, I do, Your Honor. I believe that the commission also erred in awarding the prospective surgery because there the employee's own expert, Dr. Reardon, actually testified that the prospective surgery that was ordered by the commission would not necessarily be helpful and might actually cause the employee to incur further injury with respect to the degenerative condition of her spine. Well, before we get too far into that, I mean, the critical issue is the issue of causation. She struck in the face with the ball. And obviously, to be compensable, the employment must only be a cause and effect. It doesn't have to be the sole or even the primary, as you know. That's correct. So what is, in summary, your position as to why there is no causal connection? What specific evidence are you basing that assessment on? Right. Our position is that the testimony of Dr. Weiss supports the fact that, yes, the employee was hit in the face with the ball on January 22, 2004, but it's his position that the injury that resulted to Christine Byer, the employee, was a soft tissue strain to her neck and shoulders. So what did Dr. Reardon say? Dr. Reardon stated that she had a permanent aggravation of a preexisting degenerative disease. So why isn't that a question of fact for the commission to decide which one of the two they'll believe? Because I personally believe, and it's our position, that the commission did not actually take all of the evidence, including objective tests, testimony, into consideration when they made their determination. I believe that the commission looked at the two doctors and looked at their testimony and just went either one way or the other with the testimony, but I think that that is not something that can be done in this situation, because although Dr. Reardon and Dr. Weiss were both experts that were hired to testify on behalf of each of the parties, I believe that things such as the X-ray, the MRI, the EMG, medical records, including statements of Ms. Byer stating that initially she had pain in her neck and shoulders, and then later statements that she had pain in her lower back and radiating down her arm into her pinky finger and her ring fingers. I think that the evidence needs to be looked at in a whole. You can't just look at the testimony of the two doctors. You need to look at the X-ray, which showed that the plaintiff, excuse me, the employee did, in fact, have severe degenerative disc disease in C5-6 and C6-7. Did both doctors look at the same underlying evidence? Yes. Both Dr. Weiss and Dr. Reardon looked at the X-rays, the MRI, the EMG. They looked at all of her medical records from Dr. Pearson, which was the second treater. So your real argument is that Dr. Reardon's opinion, even though it's based on the same evidence, is somehow faulty in its analysis? Well, one of the things that's so interesting about this case is that Dr. Weiss and Dr. Reardon actually both found the same findings in their research of the medical record of the employee, Christine Byer. It's just that the two doctors came to a different conclusion as to what the findings should be interpreted as the cause of the injury. And that's not completely unusual. So, I mean, more to the point, as you know, it's within the province of the commission to judge the weight of the medical testimony. So tell us why you pointed out that they, you know, looked at the same evidence, came to opposite conclusions. Why is the opinion of Reardon faulty here? Why is it not credible? I believe that the opinion of Reardon is faulty because he also stated that the, there was a radiculopathy in Christine Byer at C7, which caused pain to radiate down into her arm. However, Dr. Weiss specifically stated that the radiculopathy was not in C7, that there was in fact a tingling down her arm into her fingers, but that it was the result of a C8 and T1 radiculopathy. And I believe that in addition to just looking at all of the x-rays, MRIs, EMGs, there's also another issue at hand with this case, and that's the issue of intervening actions. And if you look at Christine Byer's record and history of medical treatment, you can see that this is not a  This is not a medical treatment.    And this is not a medical treatment. No, I agree with you. And this isn't the first time that she's treated. Obviously, I know an employer takes their employee as they find them. However, Ms. Byer specifically has had injuries previously, four injuries that were the result of working on her husband's farm. Let's assume that's true. You're obviously aware of the well-settled document that proof that the claimant's employment aggravated or accelerated a preexisting condition would be sufficient to allow compensability under the Act. So even if that's true, if the employment aggravates the preexisting condition, wouldn't recovery still be appropriate? Yes, but we don't believe that it was actually the employment and the ball hitting Christine Byer in the face that aggravated the preexisting condition. There's testimony in the medical records, and Christine Byer actually testified at the commission's hearing and stated that within a couple of days after the January 22nd, 2004 incident, she was working on her husband's farm, and she was actually throwing bales of 40-pound bales of hay over her head in her activities of performing farm work. We believe that that's an intervening cause. Why? Because we believe that there was That was going to be my next question. Okay. There was an X-ray taken. I knew it was coming. There was an X-ray taken of Christine Byer's back on January 23rd, 2004, which was the day after the incident. At that point, the X-ray only showed that there was degenerative, a severe degenerative disc condition of her spine. Now, if you look at the later, the results of the later objective tests, such as the MRI and the EMG, there is actually a degenerative disc and a lesion at C6, which is noted in the MRI, and also at C6 in the EMG. There is also an abnormality at C6. So these things were not apparent on the X-ray that were taken the day after the accident. And furthermore, I think With an X-ray with the same test that was done earlier, would that show all of those conditions? I mean, would the X-ray technology be able to disclose all of those conditions of those subsequent objective tests? I believe that it should have, yes. We can believe all we want, but I mean, is there anything that suggests that these conditions should have been on that earlier X-ray? There's no specific testimony that these conditions should have showed up on the initial X-ray. However, I think it's an important point that they did not show up on that initial X-ray, and that if Christine Byer was in the severe state and had such a severe injury as she claimed, I would question how she's physically able, when she has pain in her neck and shoulders, to throw 40-pound bales of hay over her head. Well, that may be a reasonable assumption, but we can't take judicial notice of that. I mean, there has to be something. These things have to tie in with the medical evidence and the testimony. So it may seem unusual to you, but maybe to somebody who's used to doing that, it's not unusual. Well, I think that that goes in line with Dr. Weiss's testimony. And he actually ordered that the EMG be taken in December of 2004 because he thought it was possible that the radiculopathy that he noted at C8 and T1 would actually show up on an EMG because he thought that that was possibly the reason and the cause for the pain that Ms. Byer was experiencing. However, when the results of the X-ray came back, he was baffled by the fact that there was no showing whatsoever of any injury, herniated disc, abnormality, lesion, anything like that in the C8 and T1 region. And it was surprising to him because the employee's complaints of pain were consistent with that region of her back and not consistent with the lesion that was found as a result of the EMG on the C6 area of the back. So I believe that there is no evidence to support a permanent aggravation of the severe degenerative disc disease that Ms. Byer had. And I believe that this isn't a situation where, you know, the commission could have either believed one expert or the other. I believe that the scales are in fact tipped based on the X-rays, the MRI, the EMG, Ms. Byer's own testimony regarding the locations of pain, regarding intervening actions that she took in between the accident and later X-rays and MRIs. And I believe that, in fact, the incident on January 22nd, 2004, was not the cause of Ms. Byer's current state of ill-being. And as such, I also believe that the commission erred in awarding prospective surgery. As I stated briefly, Dr. Reardon specifically stated that a surgery of the nature that was awarded is not something that is necessarily going to help Christine Byer. She has extremely severe degenerative disc disease in her back. And a surgery such as this type could potentially aggravate further problems with her back. As such, if the employee's own expert, medical expert, does not recommend a surgery, it's hard for me to understand how the commission thought that was necessary. What did Dr. Pearson recommend? I'm sorry, what did you say? What did Dr. Pearson recommend? Dr. Pearson was the treating physician for Ms. Byer. And he treated her, I believe, a couple months after the accident and then a couple months following that. What did he recommend? He did also recommend, he recommended a surgery or he recommended the shots, the Novogaine shots. Your opponent says that on page C-129 of the record, Dr. Reardon recommended an anterior cervical discectomy, infusion, removing the disc and putting in a bone graft, preferably the patient's own iliac crest bone, along with plate and screw fixation, as a result of the injury at two levels of the cervical spine. Does it say that or doesn't it? I would have to review her response, the record, and unfortunately I don't have a copy of the record. But it was my understanding, based on my reading of Dr. Reardon's testimony, that he did not, in fact, recommend the surgery. And he thought that the surgery might actually bring on more problems than benefits. Well, he said there were two options. She could live with it. Or if one or two epidural blocks did not produce relief, the only possible option was surgery. So I don't know that he recommended against it. He basically related the options. So that's a little different. Counselor, your time is up. Okay.